**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**

UNITED STATES OF AMERICA

        v.

WILLIE HARRIS,

        Defendant.

**AMENDED REPORT AND**
**RECOMMENDATION**
14-CR-6149

_____

### Preliminary Statement

On September 17, 2014, defendant Willie Harris (hereinafter Harris or defendant) was indicted on five counts of possession of cocaine with intent to distribute; use of premises to manufacture, distribute, and use controlled substances; being a felon in possession of firearms and ammunition; possession of a short-barreled shotgun; and possession of an unregistered short-barreled shotgun. See Indictment (Docket # 11). Currently before the Court[1] are motions by Harris to (1) suppress evidence obtained from the search warrant and (2) dismiss Counts Two and Four of the indictment as being multiplicitous. See Docket # 16. The Government has filed papers in opposition to the motions. (Docket # 17).

As part of his motion to suppress, the defendant contended that he was entitled to a hearing pursuant to Franks v. Delaware, 438 U.S.

_____

[1]   By Order of United States District Judge Elizabeth A. Wolford, dated September 17, 2014, all pretrial motions have been referred to this Court pursuant to 28 U.S.C. §§ 636(b)(1)(A)—(B). (Docket # 12).

154 (1978), because "the search warrant affidavit contained both incomplete and inaccurate information."   See Defendant's Motions (Docket # 16) at 8.   By letter to the Court dated December 23, 2014, the defendant submitted an affidavit from Sam DiMaggio, the apartment manager of the defendant's residence at 49 Troup Street.   See Affidavit of Sam DiMaggio (Docket # 29).   In the affidavit, DiMaggio stated that he did not make the statements attributed to him in the search warrant.   Id.   Accordingly, the Court ordered a Franks hearing regarding Mr. DiMaggio's statements to law enforcement.   The hearing with respect to the search of 49 Troup Street was held on January 30, 2015.

## Factual Background

I. The Search Warrant: On June 9, 2014, United States Magistrate Judge Marian W. Payson signed a search warrant authorizing the search of Apartment 21 located within 49 Troup Street in the City of Rochester.   The warrant (Government Exhibit 1) was based on the supporting affidavit (Government Exhibit 2) of FBI Special Agent Barry Couch and sought evidence pertaining to sex trafficking in violation of 18 U.S.C. § 1591.   Agent Couch's affidavit described an interview he conducted on May 29, 2014 with a sixteen-year-old female identified in the affidavit as CW1.   See Government Exhibit 2 at ¶ 5.   CW1 told Agent Couch that she had been working as a

2

prostitute for a "pimp" she knew as "Shawn" who resided at 49 Troup Street in Apartment 21. Id. at ¶¶ 5—6. According to CW1, she had met Shawn in April 2014 and since that time had "prostituted with approximately forty men," and about half of those sexual encounters occurred at "Shawn's residence of 49 Troup Street, Apartment 21." Id. at ¶¶ 5, 8.

After interviewing CW1, Agent Couch inspected 49 Troup Street and observed the name "Willie Harris" printed on the mailbox for Apartment 21. Id. at ¶ 11. Agent Couch also obtained a physical description of Harris and determined it matched the description of "Shawn" provided by CW1. Id. at ¶ 12. Agent Couch then spoke with two individuals associated with the Troup Street apartment complex. Id. at ¶¶ 13—14. First, Agent Couch spoke with Geetha Vijay, the property manager for 49 Troup Street who he referred to as CW2 in his warrant affidavit. Id. at ¶ 13. Agent Couch stated in his affidavit that after being shown a picture of Harris, CW2 (Vijay) "identified the male in the picture as Willie Harris and said that Willie Harris is the sole resident of Apartment 21." Id. Agent Couch next spoke with Sebastian DiMaggio, the "property supervisor" of 49 Troup Street who Agent Couch referred to in his affidavit as CW3. Id. at ¶ 14. Agent Couch averred in his affidavit that after being told that Harris may have prostituted a minor female in Apartment 21, CW3 (DiMaggio) stated that he had seen Harris with a

3

young girl and in fact Harris "had propositioned a young girl, who
appeared to be about fifteen years old, to him or anyone he knew,
for prostitution purposes just outside the apartment complex."   Id.
After concluding their interview of CW3, Agent Couch averred that
he obtained a picture of the victim (CW1) and returned to 49 Troup
Street for a supplemental interview of DiMaggio (CW3).   Id. at ¶ 15.
Agent Couch stated in his affidavit that he asked DiMaggio if the
picture depicted the young girl he had described to him earlier.   Id.
DiMaggio responded "that he could not be one hundred percent sure,
but that he thought the picture depicted the same girl."   Id.

      II. The DiMaggio Affidavit: In support of his application for
a Franks hearing, the defendant supplied to the Court an affidavit
signed by Sebastian DiMaggio on December 15, 2014.   See Affidavit
of Sam DiMaggio (Docket # 29).   In the affidavit Mr. DiMaggio stated,
inter alia, that although he was interviewed by the FBI "for about
one minute" in June of 2014, he "never suggested that Harris was
running girls out of his apartment," that "Harris never offered any
girls to me for sex or prostitution purposes," and when the agents
came back to show him the picture of the female, he "could not identify
. . . the girl they mentioned."   Id.   According to DiMaggio, Agent
Couch's affidavit in support of the search warrant was "inaccurate."
Id.   Based on Mr. DiMaggio's affidavit, the Court granted Harris's
request for a Franks hearing.

4

III. The Franks Hearing: Three witnesses testified at the Franks hearing: (1) Sebastian "Sam" DiMaggio, (2) Geetha Vijay, and (3) Special Agent Barry Couch.

A. DiMaggio: Sam DiMaggio testified that he not only works as the building superintendent at 49 Troup Street but also has resided there for a few years. Hearing Transcript ("Tr.") 4—5. DiMaggio stated that on June 5, 2014, two FBI agents came to 49 Troup Street and interviewed him about Willie Harris, who he identified as a tenant at 49 Troup Street. Tr. 6—7. Much of DiMaggio's testimony was rambling and irrelevant to the issues before the Court. As to the relevant issues, DiMaggio stated that the agents showed him two photographic arrays containing six pictures each. The first one depicted six black males. See Government Exhibit 3. DiMaggio testified that when the agents asked if he knew anyone in the first array, he responded that he did not. Tr. 5. However, when an agent then pointed to a picture of Harris, DiMaggio stated that he knew him and was able to "positively identify Mr. Harris." Tr. 6—7. According to DiMaggio, the second photographic identification procedure occurred "a few days later" and consisted of an array containing pictures of "a few girls." Tr. 21—22. DiMaggio testified that although he had seen a "white girl" with Mr. Harris, when asked on direct examination if he made an identification of the girl from the photographs, he answered that he had not. Tr. 10—11.

5

DiMaggio was then asked by defense counsel whether he "identified anyone" from the photographs, and this time he answered, "I don't think so."   Tr. 11.   However, on cross-examination, DiMaggio testified that after he was shown a single photograph of CW1 and asked if she was with Harris, he told the agents that he "couldn't be 100 percent certain that that was her."   Tr. 22.

DiMaggio's testimony was equally inconsistent on the topic of Harris's alleged prostitution activities.   At one point on direct examination, DiMaggio testified that he did not "remember telling the FBI agents anything about Mr. Harris running a prostitution business."   Tr. 11.   However, shortly before, DiMaggio had stated that he told the agents that he had seen this "white girl" in the apartment building, and she had asked him if he "want[ed] to party or something."   Tr. 8.   A few moments later during direct examination, defense counsel asked, "Did you ever tell the FBI on June 5th that Mr. Harris solicited you or offered to have a girl have sex with you?" and DiMaggio answered, "If I did, I was mistaken.   I could have, but he didn't, you know."   Tr. 9.   On cross-examination DiMaggio was even more equivocal.   When asked if he told the FBI that Harris told him that "this young girl" was also "available for your friends or anyone you knew," DiMaggio responded, "No, sir.   If I did, I mistakenly said it, okay? . . . [T]hey kept persisting.   Maybe I told them something they wanted to hear, but it was not true."   Tr.

20—21.   When asked if he ever told the FBI agents that Harris "offered a girl to you or anyone you know for the purposes of sex," DiMaggio testified that if he did, he "mistakenly said it."   Tr. 26.   Pressed on whether he could have said it, DiMaggio stated, "I could have said it, but I didn't mean it if I did."   Id.   Regarding his statements about CW1, DiMaggio was asked whether he ever "described the girl as a young looking white girl," and DiMaggio responded, "Yeah, I might have said that."   Tr. 27.

B. Vijay: Geetha Vijay testified that she is a part owner of 49 Troup Street and also serves as the property manager of the building.   Tr. 43.   Vijay stated that as property manager, she is responsible for the renting of units and overall building function, and she typically visits the property between one to five times per week.   Id.   Vijay was at 49 Troup Street "for some routine work" on June 5, 2014 when the agents appeared at the door and identified themselves, and she let them into the building.   Tr. 46.   When the agents asked Vijay whether she had seen the defendant with a young girl, she directed them to speak to DiMaggio, as she had not seen the defendant with a young girl.   Tr. 47—48.   DiMaggio then came over to speak to the agents while Vijay stood nearby, close enough to clearly hear their conversation.   Id.   Vijay testified that when the agents asked whether DiMaggio whether he had seen Harris with a young woman, DiMaggio responded that he had.   Tr. 49—50.   When the agents

asked DiMaggio if he knew what was going on with the defendant,
DiMaggio stated that Harris was "pimping" the young girl.  Tr. 50.
Vijay recalled the agents asking DiMaggio how he knew Harris was
"pimping" the girl, and DiMaggio said he knew because the defendant
had approached DiMaggio.  Id.  Vijay testified she was "shocked"
that illegal activity was occurring in her apartment building and
later addressed the issue with DiMaggio, instructing him that he "was
not to allow that to happen."  Tr. 49—51.

   C. Special Agent Couch: Special Agent Barry Couch testified that
he is employed by the FBI to investigate "violations committed
against children," and after interviewing CW1, he went to 49 Troup
Street with the intention of speaking to Harris.  Tr. 58—59.  Upon
arrival, Agent Couch and Federal Task Force Officer Brian Tucker
introduced themselves to Vijay, who indicated that she knew the
defendant to be one of the men in a photographic array.  Tr. 60, 62.
Vijay told the agents that she did not know anything about the
defendant "prostituting minors out of that apartment," and she
directed the agents to Mr. DiMaggio.  Tr. 61.  Agent Couch testified
that he showed DiMaggio a photographic array containing a picture
of Harris and asked DiMaggio if he recognized anyone in the array.
Tr. 70.  DiMaggio "shook his head and acted like he didn't."  Id.
However, when Officer Tucker specifically pointed to the photograph
of the defendant and asked, "[I]s that Willie," DiMaggio identified

8

the picture as Harris.   Tr. 70—71.

Agent Couch stated that as they interviewed DiMaggio, Vijay
stood nearby.    DiMaggio told the agents that Harris "had
propositioned a young looking 15-year-old girl to him outside of the
apartment complex."   Tr. 65.   Agent Couch testified that DiMaggio
told them that Harris had "offered up the girl to him or anybody else
he knew."   Tr. 66—67.   Agent Couch stated that after they completed
their initial interview of DiMaggio, the agents left and returned
later with a single, "very large" photograph of CW1.   Tr. 88—89.
According to Agent Couch, DiMaggio stated that he believed it was
a photograph of the girl offered to him for prostitution purposes,
but he couldn't be "100 percent sure."   Tr. 68—69, 89.

Agent Couch testified that he included the information obtained
from DiMaggio and Vijay in his search warrant application and then
returned to 49 Troup Street with the search warrant.   Tr. 74, 90.
Agent Couch and Officer Tucker encountered Harris as they approached
the apartment.   Tr. 91.   After advising Harris that they had a search
warrant, Agent Couch asked Harris if there were any weapons in the
apartment, and Harris admitted that he had weapons and narcotics in
his apartment.   Tr. 93.   The search warrant was then executed.   Tr.
94—95.

Special Agent Couch testified that the search warrant and
application for a warrant accurately reflected the substance of the

9

agents' conversations with Ms. Vijay and Mr. DiMaggio on June 5, 2014.

Tr. 73, 76.   Agent Couch testified he did not include DiMaggio's
identification of Harris from the array "[b]ecause it wasn't needed
for the probable cause for the search warrant."   Id.   Agent Couch
also testified that he showed CW1 a photographic array on June 6,
2014, and she pointed to an individual other than Harris and stated
that he looked "familiar."   Tr. 78.   CW1 viewed the array on the
street and appeared to be "nervous that we were talking to her."   Id.
Agent Couch then told CW1 that this was "very important" and she
"need[ed] to be completely straight forward with us."   Tr. 78—79.
Agent Couch asked her a second time whether she recognized anyone,
and CW1 immediately pointed to the photograph of Harris.   Tr. 79.
Agent Couch stated that he also left this identification procedure
out of the search warrant application.   Tr. 79.

## Discussion

I.   **The Franks Hearing:** This Court granted a Franks hearing
based on an affidavit the defense submitted from Sam DiMaggio in which
he stated that the information Agent Couch included in paragraphs
fourteen and fifteen of the warrant application was "inaccurate."
See Affidavit of Sam DiMaggio (Docket # 29).   DiMaggio averred that
he "never suggested [to Agent Couch] that Harris was running girls
out of his apartment," that "Harris never offered any girls to me

10

for sex or prostitution purposes," and that when shown a photographic array containing a picture of CW1, he "never identified the girl they wanted me to."  Id.

"Ordinarily, a search carried out pursuant to a warrant is presumed valid.  However, in certain circumstances, Franks permits a defendant to challenge the truthfulness of factual statements made in the affidavit, and thereby undermine the validity of the warrant and the resulting search or seizure."  United States v. Mandell, 752 F.3d 544, 551–52 (2d Cir. 2014) (quotation marks and citations omitted), cert. denied, ___ U.S. ___, 135 S. Ct. 1402 (2015).  "[T]o suppress evidence obtained pursuant to an affidavit containing erroneous information, the defendant must show that: (1) the claimed inaccuracies or omissions are the result of the affiant's deliberate falsehood or reckless disregard for the truth; and (2) the alleged falsehoods or omissions were necessary to the issuing judge's probable cause or necessity finding."  United States v. Rajaratnam, 719 F.3d 139, 146 (2d Cir. 2013) (quoting United States v. Canfield, 212 F.3d 713, 717-18 (2d Cir. 2000)) (quotation marks and brackets omitted), cert. denied, ___ U.S. ___, 134 S. Ct. 2820 (2014).  The defendant has failed to meet his burden on either of the required showings.

First, Harris has failed to convince the Court that there are any material inaccuracies in the search warrant.  On the key issues,

11

DiMaggio's testimony was hardly a model of clarity or consistency. For example, as to whether Harris had prostituted a young girl to him or anyone he knew, DiMaggio at one point stated that he made no such statements but then repeatedly testified that while he did not remember telling the agents that, he "could have said it," that if he did, he "mistakenly said it," and "maybe I told them something they wanted to hear, but it was not true." DiMaggio's suddenly foggy recollection of Harris's alleged prostitution activities was contradicted by the unequivocal testimony of his supervisor, Ms. Vijay. Vijay testified that she was "shocked" when she heard DiMaggio tell the agents that Harris was "pimping" a young girl in the apartment complex and that DiMaggio stated that Harris had actually offered the girl to DiMaggio for sex. DiMaggio was equally obtuse when asked about whether he identified a photograph of CW1 as being with Harris. DiMaggio's answers morphed from "no" to "I don't think so" to saying he recognized the person in the photo but was not "100 percent certain."

Put simply, DiMaggio's testimony was "all over the place" and just not credible. The Court concludes that DiMaggio's recollection of his encounter with Agent Couch was influenced by both his relationship with Harris and his desire to keep his job by not admitting that he knew Harris was "pimping" young girls at the apartment complex. DiMaggio's equivocal and vacillating testimony

12

on the alleged inaccuracies in Agent Couch's supporting affidavit
fall far short of demonstrating that Agent Couch intentionally misled
Judge Payson into issuing a warrant without probable cause.

"[T]he subject of [a Franks] hearing is the veracity of the
affiant, not of persons on whom he justifiably relied."   United
States v. Barone, 787 F.2d 811, 814 (2d Cir. 1986).   Agent Couch's
hearing testimony was credible and fully consistent with the
information he utilized in his supporting affidavit.   I find no basis
to support Harris's allegations that Agent Couch made "intentional
and material misrepresentations or omissions in the warrant
affidavit."   Mandell, 752 F.3d at 552 (citing Franks, 438 U.S. at
64—65) (quotation marks omitted).

Further, I find that any "incomplete" or "inaccurate"
information was not material to Judge Payson's finding of probable
cause.   This Circuit has stated that "[t]he ultimate inquiry is
whether, after putting aside erroneous information and material
omissions, there remains a residue of independent and lawful
information sufficient to support probable cause."   Canfield, 212
F.3d at 718 (quotation marks omitted).   Here, even if paragraphs
fourteen and fifteen were removed from Agent Couch's affidavit, there
remained sufficient evidence to support a finding of probable cause
to search the residence.   Paragraphs five through ten describe Agent
Couch's interview with CW1 with sufficient particularity for Judge

Payson to reasonably conclude that CW1 had engaged in illegal prostitution activities at 49 Troup Street, Apartment 21. Paragraphs eleven and twelve confirm that Agent Couch corroborated CW1's information by matching the physical description of the current resident with CW1's description of the defendant.   Accordingly, even excluding the allegedly inaccurate and misleading information, there still existed probable cause to believe that Apartment 21 contained evidence related to sex trafficking in violation of 18 U.S.C. § 1591. See, e.g., United States v. Vonneida, No. 11-CR-6210, 2012 WL 6651919, at *6 (W.D.N.Y. Nov. 1, 2012) (even assuming statements in warrant were false, other evidence set forth in affidavit supported finding of probable cause), Report and Recommendation adopted, 2012 WL 6651927; United States v. Brome, No. 11-CR-6089, 2012 WL 4490664, at *9 (W.D.N.Y. Sept. 5, 2012) (even without erroneous statements, affidavit contained sufficient basis for probable cause finding), Report and Recommendation adopted, 2012 WL 4481438.   For these reasons, it is my Report and Recommendation that defendant's motion to suppress the search of Apartment 21 of 49 Troup Street be **denied**.

## II.   Motion to Dismiss Counts Two and Four:

A. Count Two: Harris contends that Count Two of the indictment, which charges a violation of 21 U.S.C. § 856(a)(1), should be dismissed as multiplicitous with Count One, which charges a violation

14

of 21 U.S.C. §§ 841(a)(1) and (b)(1)(c). See Defendant's Motions (Docket # 16) at 3—6. According to Harris, he "is being charged twice for allegedly having drugs in his home." See Defendant's Motions (Docket # 16) at 4.

"An indictment is multiplicitous when it charges a single offense as an offense multiple times, in separate counts, when, in law and fact, only one crime has been committed." United States v. Chacko, 169 F.3d 140, 145 (2d Cir. 1999) (citing United States v. Holmes, 44 F.3d 1150, 1153—54 (2d Cir. 1995)). "The multiplicity doctrine is based upon the double jeopardy clause of the Fifth Amendment, which assures that the court does not exceed its legislative authorization by imposing multiple punishments for the same offense." United States v. Maldonado-Rivera, 922 F.2d 934, 969 (2d Cir. 1990) (quotation marks and brackets omitted), cert. denied, Ramirez-Talavera v. United States, 501 U.S. 1211 (1991) and Segarra-Palmer v. United States, 501 U.S. 1233 (1991). "[T]he critical double jeopardy inquiry is not factual, i.e., whether the same conduct is at issue in charges brought under different statutes, but legal, i.e., 'whether the 'offense' — in the legal sense, as defined by Congress — complained of in one count is the same as that charged in another.'" United States v. Basciano, 599 F.3d 184, 198 (2d Cir. 2010) (quoting Chacko, 169 F.3d at 146). It is well-settled law that "the test to be applied to determine whether there are two

15

offenses or only one, is whether each provision requires proof of
a fact which the other does not."   Blockburger v. United States, 284
U.S. 299, 304 (1932).

     I find that Count Two is not multiplicitous with Count One
because Count Two requires proof of an element that is separate and
distinct from Count One.   Count One requires that the government
prove (1) that the defendant knowingly possessed cocaine, (2) that
the defendant knew that this substance was cocaine, and (3) that the
defendant intended to distribute some or all of this cocaine.   See
2B Fed. Jury Prac. & Instr. § 64:07 (6th ed. 2014).   Count Two,
however, requires proof that the defendant (1) used and maintained
a place, (2) for the purpose of distributing, manufacturing, and
using cocaine, and (3) that the defendant did so knowingly.   See
United States v. Snow, 462 F.3d 55, 70–71 (2d Cir. 2006), cert.
denied, 549 U.S. 1150 (2007); United States v. Becerra, 97 F.3d 669,
672 (2d Cir. 1996), cert. denied, Moreno v. United States, 519 U.S.
1137 (1997).   Therefore, Count One focuses on the possession of and
intent to distribute a controlled substance, whereas Count Two
focuses on the use of a premises for manufacturing, distributing,
or using any controlled substance.   These separate crimes, requiring
proof of separate elements and facts, do not offend the Double
Jeopardy Clause, and I find that they are not multiplicitous.

     B. Count Four: Harris also contends that Count Four of the

16

indictment, which charges a violation of 26 U.S.C. §§ 5822, 5845(a), 5861(c), and 5871, should be dismissed because it is a lesser included offense of Count Five, which charges a violation of 26 U.S.C. §§ 5841, 5845(a), 5861(d), and 5871.  See Defendant's Motions (Docket # 16) at 5.

According to Harris, "Count Four charges Harris with possessing a short-barreled shotgun, while Count Five charges him with possessing an unregistered short-barreled shotgun.  One cannot possess an unregistered, short[-]barrel[ed] shotgun without also possessing a short-barreled shotgun."  Id.  In support of his argument, Harris relies on the Eighth Circuit's opinion in United States v. Mann, 701 F.3d 274 (8th Cir. 2012), cert. denied, ___ U.S. ___, 134 S. Ct. 470 (2013).  In Mann, the Eighth Circuit found possession of an unregistered machine gun under 28 U.S.C. § 5861(d) to be a lesser included offense of simple possession of a machine gun under 18 U.S.C. § 922(o) because only one of the charges, possession of an unregistered machine gun, required proof of an element not required by the other.  Id. at 286.

The government responds by arguing that Courts Four and Five each have elements unique to the charge and thus require different proof to sustain a conviction.  In its unfiled post-hearing letter brief, the government contends that Count Four requires the government to prove that the firearm was made in accordance with 26

17

U.S.C. § 5822 which requires, *inter alia*, that "no person shall make a firearm" unless he has "filed an application, paid any tax due and received approval from the government to make and register the firearm," and Count Five requires the government to prove that that the shotgun was not registered to the defendant in the National Firearms Registration and Transfer Record.   According to the government, the Mann case is distinguishable because unlike the statutes at issue in Mann, each count here "requires proof of elements independent of one another."

The government does not cite to any cases which have analyzed whether a violation of 26 U.S.C. § 5822 is a lesser included offense of a violation of 26 U.S.C. § 5861.  Instead, the government argues that Counts Four and Five each require proof of facts independent of one another and therefore a violation of Count Five does not necessarily encompass a violation of Count Four.  However, after examining the relevant statutes, this Court is not convinced that the issue lacks merit.  It is conceivable that an individual could possess a firearm that was lawfully made under § 5822, but still violate § 5861 by illegally obtaining (*i.e.*, stealing) that otherwise lawfully made firearm without having obtained proper registration. Conversely, however, it is difficult to imagine how an individual could lawfully register a firearm pursuant to § 5861 that was illegally "made" in violation of § 5822.  In other words, if Harris

18

knowingly possessed an illegally "made" short-barreled shotgun, has he not by necessity possessed a shotgun that was not legally registered to him as well? And if so, is § 5861(c) a lesser included offense of § 5861(d)?

Because the Court finds that the lesser included offense issue outlined above has not been adequately addressed in the current record, additional briefing is necessary. Accordingly, counsel shall appear before the Court on **June 30, 2015 at 9:30 a.m.** to discuss the scope of further submissions. The Court therefore will reserve decision on Harris's motion to dismiss Count Four of the Indictment pending supplemental proceedings. A separate Report and Recommendation will be issued on this issue.

### Conclusion

For the foregoing reasons, it is my Report and Recommendation that defendant's motion to suppress (Docket # 16) be **denied** and that defendant's motion to dismiss Count Two also be **denied**. The defendant's motion to dismiss Count Four of the indictment is reserved for further briefing and argument as set forth in this Report and Recommendation.

SO ORDERED.

JONATHAN W. FELDMAN
United States Magistrate Judge

Dated:   July 2, 2015
         Rochester, New York

19

Pursuant to 28 U.S.C. § 636(b)(1), it is hereby

**ORDERED**, that this Report and Recommendation be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of this Court within fourteen (14) days after receipt of a copy of this Report and Recommendation in accordance with the above statute and Rule 59(b)(2) of the Local Rules of Criminal Procedure for the Western District of New York.[1]

The district court will ordinarily refuse to consider on *de novo* review arguments, case law and/or evidentiary material which could have been, but was not, presented to the magistrate judge in the first instance. See, e.g., Paterson-Leitch Co., Inc. v. Mass. Mun. Wholesale Elec. Co., 840 F.2d 985 (1st Cir. 1988).

Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order. Thomas v. Arn, 474 U.S. 140 (1985); Wesolek v. Canadair Ltd., 838 F.2d 55 (2d Cir. 1988).

The parties are reminded that, pursuant to Rule 59(b)(2) of the Local Rules of Criminal Procedure for the Western District of New York, "[w]ritten objections . . . shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for each objection, and shall be supported by legal authority." Failure to comply with the provisions of Rule 59(b)(2) may result in the District Court's refusal to consider the objection.

Let the Clerk send a copy of this Order and a copy of the Report and Recommendation to the attorneys for the Plaintiff and the Defendant.

SO ORDERED.

JONATHAN W. FELDMAN
United States Magistrate Judge

Dated:     July 2, 2015
           Rochester, New York

---

[1]     Counsel is advised that a new period of excludable time pursuant to 18 U.S.C. § 3161(h)(1)(D) commences with the filing of this Report and Recommendation.   Such period of excludable delay lasts only until objections to this Report and Recommendation are filed or until the fourteen days allowed for filing objections has elapsed.   United States v. Andress, 943 F.2d 622 (6th Cir. 1991), cert. denied, 502 U.S. 1103 (1992); United States v. Long, 900 F.2d 1270 (8th Cir. 1990).

20